the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 16, 2024

**2024 CO 2**

**No. 23SA140, *People v. Dye*—Alternate Suspect Defense—Crim. P. 16(II)(c)—Defendant's Discovery Obligations—"Nature of Any Defense"—*People v. Elmarr*, 2015 CO 53, 351 P.3d 431—Timing of Admissibility Determinations—Discretion to Hold a Hearing**

In *People v. Elmarr*, 2015 CO 53, 351 P.3d 431, the supreme court established the proper framework for analyzing the admissibility of alternate suspect evidence. Mindful of the decision in *Elmarr* and Crim. P. 16(II)(c), today the supreme court outlines the procedural mechanics litigants and trial courts should employ to implement that framework. Because the district court's discovery order in this case was overly broad, the supreme court makes absolute the rule to show cause.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2024 CO 2

### Supreme Court Case No. 23SA140
*Original Proceeding Pursuant to C.A.R. 21*
Weld County District Court Case No. 21CR586
Honorable Marcelo Adrian Kopcow, Judge

### In Re
### Plaintiff:

The People of the State of Colorado,

v.

### Defendant:

James Herman Dye.

### Rule Made Absolute
*en banc*
January 16, 2024

**Attorneys for Plaintiff:**
Michael J. Rourke, District Attorney, Nineteenth Judicial District
Steve Wrenn, Chief Deputy District Attorney
     *Greeley, Colorado*

**Attorneys for Defendant:**
Megan A. Ring, Public Defender
Reshaad Shirazi, Deputy Public Defender
Jennifer Ahnstedt, Deputy Public Defender
John Walsh, Deputy Public Defender
     *Greeley, Colorado*

**Attorneys for Respondent Weld County District Court:**
Philip J. Weiser, Attorney General
Emily Burke Buckley, Senior Assistant Attorney General
*Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE MÁRQUEZ**, **JUSTICE HOOD**, **JUSTICE GABRIEL**, **JUSTICE HART**, and **JUSTICE BERKENKOTTER** joined.

JUSTICE SAMOUR delivered the Opinion of the Court.

¶1   In whodunnit criminal cases, the defendant will sometimes point the finger at another person—in legal parlance, an alternate suspect. The alternate suspect defense seeks to cast reasonable doubt on the defendant's guilt by tying someone else to the charged crime and making the defendant's identity as the perpetrator less probable.

¶2   In this whodunnit criminal case, James Herman Dye informed the district court during a pretrial hearing that he was considering presenting alternate suspect evidence at trial to defend against charges that he murdered a woman in rural Greeley, Colorado, over forty years ago. But he asked the court to declare that he was under no obligation to endorse the alternate suspect defense, let alone disclose before trial any information related to that defense. The prosecutors objected, arguing that Dye was seeking permission to subject them to trial by ambush. They requested that, if Dye intended to pursue the alternate suspect defense, he be required to disclose any alternate suspect's name and all the evidence bearing on that defense. They further urged the court to hold a pretrial hearing to address the admissibility of any alternate suspect evidence.

¶3   Although the district court acknowledged that there is no provision in Rule 16 of the Colorado Rules of Criminal Procedure ("Discovery and Procedure Before Trial") expressly addressing pretrial disclosures related to the alternate suspect

3

defense, it nevertheless ordered Dye to disclose, at least forty-five days before trial, "all evidence" related to that defense. *See* Crim. P. 16(II)(c). In doing so, the court relied on the provision in Crim. P. 16(II)(c) that directs a defendant to disclose "the nature of any defense, other than alibi." Dye then invoked our original jurisdiction by filing a C.A.R. 21 petition, and we, in turn, issued a rule to show cause.

¶4 Dye now contends that the requirement in Crim. P. 16(II)(c) to disclose "the nature of any defense" is inapposite because it covers only affirmative defenses. The alternate suspect defense, Dye maintains, is not an affirmative defense. The district court and the prosecution counter that Colorado law authorizes the challenged discovery order. We agree with neither proposition. On the one hand, our construction of "the nature of any defense" in Crim. P. 16(II)(c) differs from Dye's. On the other, we conclude that the district court's order requiring Dye to provide all evidence bearing on the alternate suspect defense is overbroad.

¶5 We hold that "any defense" in Crim. P. 16(II)(c) means *any defense*, not just *any affirmative defense*. It follows that the reference to "any defense" necessarily includes the alternate suspect defense; therefore, the alternate suspect defense must be endorsed before trial.

¶6 We further hold that when the alternate suspect defense is endorsed, Crim. P. 16(II)(c)'s disclosure requirement regarding "the nature of any defense" includes the identity of any alternate suspect. An alternate suspect who is

4

unidentifiable by name must be otherwise identified—e.g., the person whose DNA profile was located at the crime scene but who has not yet been identified by name. Further, to the extent a defendant intends to call an alternate suspect to testify at trial, the alternate suspect's address, just like the address of any other defense witness, must be provided to the prosecution. *See* Crim. P. 16(II)(c). All these disclosures must be made no later than thirty-five days before a felony trial or seven days before a non-felony trial, unless the court extends the applicable deadline for good cause. *Id.* In the alternate-suspect-defense context, Crim. P. 16(II)(c) permits a defendant to do nothing less and authorizes a trial court to order nothing more.

¶7    Once a defendant timely endorses the alternate suspect defense, identifies any alternate suspects, and discloses the addresses of any alternate suspects who will be called to testify, Crim. P. 16(II)(c) is satisfied. It is then up to the prosecution to conduct its own investigation into any alternate suspect identified. Following any such investigation, if the prosecution has a good faith belief that alternate suspect evidence is inadmissible under the criteria we articulated in *People v. Elmarr*, 2015 CO 53, 351 P.3d 431, it must file, without undue delay, a pretrial objection explaining its position.[1]

---

[1] In *Elmarr*, we held that "the admissibility of alternate suspect evidence ultimately depends on the strength of the connection between the alternate suspect and the

5

¶8 But that begs the question: Should a trial court resolve disputes related to the admissibility determinations delineated in *Elmarr* before trial or may it wait to do so until the middle of trial? Today we clarify that, given the weighty and consequential character of those determinations, a trial court should resolve any such dispute *before* trial, though we leave to its sound discretion when precisely to take this pretrial action. We caution trial courts to guard against proceeding prematurely. At the other end of the spectrum, we caution trial courts to guard against letting the issue linger until the eve of trial.

¶9 Along the same lines, we conclude that whether to hold a hearing in connection with the *Elmarr*-required admissibility determinations is also a matter within a trial court's discretion. Depending on the circumstances involved in a particular case, a hearing may (or may not) be warranted. If a trial court does hold a hearing, a defendant may proceed by offer of proof. We stress that the purpose of any such hearing would be strictly to permit the adjudication of a good faith

---

charged crime." ¶ 22, 351 P.3d at 438. The evidence must be relevant (meaning, in this context, that it must establish a non-speculative connection between the alternate suspect and the crime), and its probative value must not be substantially outweighed by any of the concerns listed in CRE 403. *Id.* at ¶¶ 22–23, 351 P.3d at 438. Relatedly, we provided a roadmap in *Elmarr* for ascertaining the admissibility of other acts or transactions and out-of-court statements by an alternate suspect. *Id.* at ¶¶ 23–24, 351 P.3d at 438.

6

objection to the admissibility of alternate suspect evidence, not to allow the prosecution to embark upon a fishing expedition.

¶10 When confronting a prosecutor's good faith objection, a trial court's gatekeeping function under *Elmarr* may occasionally require a defendant to share additional information about the alternate suspect defense; otherwise, a trial court may be unable to make the requisite admissibility determinations. Such information would not implicate Crim. P. 16(II)(c) because it would not constitute discovery to be provided to the prosecution. Instead, it would be akin to the type of information defendants must sometimes proffer to permit a trial court to make pretrial rulings on the admissibility of their proposed evidence.

¶11 The district court and the prosecution observe that the information already in discovery and previously adduced during pretrial hearings will almost always suffice to permit a trial court to make the admissibility determinations mandated by *Elmarr*. We are inclined to agree and thus expect that a defendant will rarely need to offer a trial court previously undisclosed information regarding the alternate suspect defense.

¶12 All that to say that today's decision carves out a path between Dye's overly restrictive reading of Crim. P. 16(II)(c)—requiring no disclosures related to the alternate suspect defense—and the district court's overly broad order—requiring disclosure of all the evidence bearing on that defense. Thus, we strike a balance

7

between the two proposed disclosure approaches: not too little and not too much. Along the way, we reject Dye's argument that requiring him to make any disclosures related to the alternate suspect defense violates his constitutional rights. Accordingly, while we decline to provide the relief Dye requests, we nevertheless make the rule absolute.

## I. Facts and Procedural History

¶13 Just five days after Thanksgiving in 1979, Charles "Chuck" Day notified the police that his wife, Evelyn "Kay" Day, was missing.[2] He explained that he had last heard from her the previous evening when she called to let him know she would be staying late at Aims Community College ("Aims"), where she worked as a lab monitor. According to Chuck, he had driven to the Aims campus and had also called Kay's doctor, friends, and colleagues, but had been unable to find her. Additionally, he'd contacted a hospital and the couple's bank to no avail.

¶14 Later, as Patricia Harden, one of Kay's colleagues, was leaving the Aims campus, she and her carpool noticed Kay's car parked on the shoulder of the road. As they approached for a closer look, they discovered that Kay's body was in the

---

[2] Because the victim and her husband share the same last name, we refer to him as "Chuck" and to her as "Kay." This informality is solely for the purpose of avoiding confusion; we mean no disrespect.

8

back of the vehicle. It was later determined that Kay had been sexually assaulted and then strangled by the belt removed from the jacket she was wearing.

¶15 During Kay's autopsy, the coroner collected vaginal swabs, and those swabs, along with some items of clothing, were tested in 1979 and 1980. This testing revealed the presence of both spermatozoa on the vaginal swabs and seminal fluid on the crotch area of Kay's underwear. Although Chuck was excluded as the source of the spermatozoa, he was considered the prime suspect in the investigation.

¶16 The case lay dormant for several decades. By 2011, however, technological advances allowed for further forensic testing, which identified Chuck's DNA on the belt used to strangle Kay. He thus remained the primary suspect in his wife's murder.

¶17 But nine years later, after the Weld County Sheriff's Office created a cold case unit, the DNA profile developed from the sperm fraction found in the vaginal swabs was resubmitted to the Combined DNA Index System ("CODIS"), a national DNA database. CODIS matched that DNA profile to Dye's. Thereafter, Dye's DNA was also located on Kay's coat, pantyhose, underwear, pants, and the belt with which she'd been strangled, as well as underneath her fingernails.

¶18 As they focused their attention on Dye, investigators learned that he had been a student at Aims in November 1979 (when Kay was killed), and that he had

9

been on parole at the time for a 1977 sexual assault that shared similarities with the one involving Kay. In March 2021, Dye was charged with Kay's murder. Specifically, the prosecution filed charges of first degree murder after deliberation and felony murder.

¶19 At his preliminary hearing, Dye elicited testimony from the prosecution's witnesses aimed at implicating Chuck. Dye also called the investigation's former lead detective to the stand to discuss the evidence that initially led law enforcement to consider Chuck the primary suspect. And in his written argument to the court following the preliminary hearing, Dye asserted that the evidence pointed to one conclusion: Chuck had killed his wife. There was no mention of another alternate suspect either at the preliminary hearing or in Dye's subsequent written argument.

¶20 Following the preliminary hearing, the district court found that there was probable cause to believe Dye had committed the crimes charged. Dye later filed a prophylactic motion seeking an order declaring that there's no requirement to disclose before trial an intent to offer evidence of an alternate suspect. He argued that there is "simply no mechanism—constitutional, statutory, rule[-based] or otherwise—to require the defen[dant] to make disclosures about the nature or content of the alternate suspect evidence he may introduce at trial." The prosecutors objected, contending that Dye was seeking permission "to ambush"

10

them at trial. According to the prosecutors, to prevent that from happening, they were entitled to a pretrial hearing and disclosure of all of Dye's evidence bearing on the alternate suspect defense.

¶21 At a subsequent hearing, the district court expressed concern that it was entertaining a purely "academic exercise," since the cat was already out of the bag. Given statements previously made by the defense at the preliminary hearing and in multiple pleadings, the court discerned that the prosecution was clearly "on notice" that Chuck was the alternate suspect. The court wondered, then, "why we're having this discussion." Continuing, the court asked, "Is there another alternate suspect?" Dye's counsel responded that he couldn't "share that information with the court."

¶22 The district court ultimately ordered Dye to disclose both his intent, if any, "to offer alternate suspect evidence" and "the nature of any alternate suspect evidence." More specifically, it ruled that, to the extent Dye intended to assert the alternate suspect defense at trial, he was required to produce before trial "all evidence" bearing on that defense. While acknowledging the absence of any "legal provision regarding mandatory pretrial disclosures that mentions alternate suspect evidence by name," the court nonetheless reasoned that Crim. P. 16(II)(c), which requires the disclosure of "the nature of any defense," authorized its order. Further, explained the court, given the age of the case and the voluminous

11

discovery involved, the analysis related to the admissibility of any alternate suspect evidence was likely to be laborious. To give itself "enough time to examine any alternate suspect evidence" and make the admissibility determinations required by *Elmarr*, the court ordered Dye to disclose all alternate suspect evidence no later than forty-five days before trial. The court believed that this deadline would prevent trial by ambush without prejudicing Dye.

¶23 Dye sought reconsideration of the district court's order, but the court denied his motion. That prompted Dye to invoke our original jurisdiction via a C.A.R. 21 petition. We then issued a rule to show cause. We explain next why we are exercising our original jurisdiction.

## II. Original Jurisdiction

¶24 C.A.R. 21 recognizes that the exercise of our original jurisdiction is entirely within our discretion. C.A.R. 21(a)(1). Relief pursuant to our original jurisdiction "is extraordinary in nature." *Id.* Therefore, in the past, we have cabined the exercise of our original jurisdiction to such circumstances as when the normal appellate process would prove inadequate, a party may suffer irreparable harm, or there is an issue of first impression that has significant public importance. *See People v. Platteel*, 2023 CO 18, ¶ 21, 528 P.3d 176, 180 (citing *People v. Hacke*, 2023 CO 6, ¶ 7, 524 P.3d 8, 11).

12

¶25 Dye maintains that the district court's order not only requires him to turn over evidence that suggests what his defense is, it also forces him to reveal to the prosecution all the evidence supporting that defense. What's more, continues Dye, the order imposes an earlier deadline than the one set forth in Crim. P. 16(II)(c). Thus, according to Dye, the order adversely affects his ability to litigate the merits of the case and, if erroneous, cannot be cured on direct appeal.

¶26 We agree with Dye that the normal appellate process is inadequate to address the issues he raises. If the district court's order were allowed to stand, it would improperly obligate Dye to comply with the earlier deadline imposed and, more importantly, to disclose all his alternate suspect evidence to the prosecution. And an appellate court could not return the parties to their original positions. As the old saying goes, "You can't unscramble an egg."

¶27 We also agree with Dye that this is a novel issue of significant public importance. Although our decision in *Elmarr* established the proper framework for analyzing the admissibility of alternate suspect evidence, in the eight years since, we have not had occasion to outline the mechanism litigants and trial courts should employ to implement that framework. Indeed, the district court correctly noted that "[t]here is little law directly addressing if and when a defendant must present the court and the prosecution with an offer of proof supporting the introduction of alternate suspect evidence."

¶28    Because Dye has no other adequate remedy, and because his petition presents an issue of first impression that is important to Coloradans, the exercise of our original jurisdiction is warranted in this case.

¶29    We are not persuaded otherwise by the prosecution's assertion that Dye is seeking an advisory opinion on a hypothetical situation. The prosecution reminds us that it is already on notice that Dye may seek to introduce evidence that Chuck killed his wife. Further, it informs us that it does not intend to contest the admissibility of any evidence in support of this theory, many aspects of which have apparently been litigated and deemed admissible already.

¶30    But the prosecution appears to forget what prompted its objection to Dye's prophylactic motion in the first place—namely, Dye's refusal to specify whether he intends to rely on the alternate suspect defense at trial, and if so, whether Chuck is the only alternate suspect. Dye is asking us to vacate the discovery order requiring him to first make extensive pretrial disclosures before he may present alternate suspect evidence. To be sure, if Dye doesn't intend to present alternate suspect evidence, the issue is moot. But, at this point, we don't know what his intention is, and he's asking us to rule that he need not divulge his intention. Even if Dye's intention is to introduce alternate suspect evidence related solely to Chuck, there are live issues as to whether Dye must disclose that intention and make additional disclosures before trial. Of course, it's possible Dye intends to

14

point the finger at other alternate suspects; if that's the case, the questions of whether he must share that intent with the prosecution and make pretrial disclosures regarding such individuals are certainly not moot.

¶31 Because we have jurisdiction over Dye's petition, we move on to address the questions he brings before us.

## III. Analysis

¶32 We set out on our analytical course by acknowledging the standard that controls our review. Against that backdrop, we proceed to tackle the merits of the legal issues presented. We start by construing the requirement in Crim. P. 16(II)(c) to disclose "the nature of any defense." We then discuss the admissibility determinations required by *Elmarr* when a defendant seeks to introduce alternate suspect evidence at trial. Mindful of Crim. P. 16(II)(c) and *Elmarr*, we next lay out the procedures litigants and trial courts should follow when a defendant wishes to introduce alternate suspect evidence. After doing so, we consider but ultimately reject Dye's constitutional contentions. Because we make absolute the rule to show cause, we end by providing remand instructions to the district court.

## A. Standard of Review

¶33 Under article VI, section 21 of the Colorado Constitution, this court enjoys "plenary authority to promulgate and interpret the Colorado Rules of Criminal Procedure." *People v. Angel*, 2012 CO 34, ¶ 13, 277 P.3d 231, 234. The fundamental

15

purpose of the rules of criminal procedure is "to provide for the just determination of criminal proceedings." Crim. P. 2 ("Purpose and Construction"). The rules aim "to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay." *People v. Steen*, 2014 CO 9, ¶ 10, 318 P.3d 487, 490 (quoting Crim. P. 2).

¶34 Like questions of statutory interpretation, questions of rule interpretation are questions of law subject to de novo review. *People v. A.S.M.*, 2022 CO 47, ¶ 14, 517 P.3d 675, 678; *see also Northstar Project Mgmt., Inc. v. DLR Grp., Inc.*, 2013 CO 12, ¶ 12, 295 P.3d 956, 959 (stating that we review de novo a district court's interpretation of a rule of procedure). We acknowledge that a discovery order is committed to the sound discretion of a trial court. *Angel*, ¶ 13, 277 P.3d at 234. However, the interpretation of the rule of procedure on which such an order is grounded "is a question of law, which we review de novo." *Id.*

¶35 In construing our rules of criminal procedure, we rely on "the same interpretive rules applicable to statutory construction." *Id.* at ¶ 17, 277 P.3d at 235 (quoting *People v. Fuqua*, 764 P.2d 56, 58 (Colo. 1988)). That is, we first read the language of the rule to discern its plain and ordinary meaning. *Id.* If the language is unambiguous, we go no further and apply it as written. *Id.*

16

## B. Crim. P. 16(II)(c)

¶36 Crim. P. 16 governs discovery in criminal cases. Part II of the rule addresses disclosures a defendant must make to the prosecution. *See* Crim. P. 16(II). Subsection (c) within Part II, titled "Nature of Defense," provides that, "[s]ubject to constitutional limitations," a defendant must "disclose to the prosecution the nature of any defense, other than alibi," intended to be used at trial. Crim. P. 16(II)(c).

¶37 Dye argues that Crim. P. 16(II)(c) is irrelevant because it covers only affirmative defenses, and the alternate suspect defense is not an affirmative defense. But the language of Crim. P. 16(II)(c) contradicts Dye's position. Subsection (II)(c) refers broadly to *any defense*, not narrowly to *any affirmative defense.* Had we intended to limit the scope of this provision to affirmative defenses, we would have said so. Because the rule's language is unambiguous, we apply it as written based on its plain and ordinary meaning.

¶38 As pertinent here, the word "any" is defined as "every" or "all." *Any*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ any [https://perma.cc/4WVN-K99T]; *see also Cowen v. People*, 2018 CO 96, ¶ 14, 431 P.3d 215, 218 ("When determining the plain and ordinary meaning of words, we may consider a definition in a recognized dictionary."). Thus, we hold that

17

Crim. P. 16(II)(c) requires a defendant to disclose the nature of *every* defense (other than alibi), including the alternate suspect defense.[3]

¶39 According to Dye, however, even if Crim. P. 16(II)(c) is apposite, it requires nothing more of him than to file an endorsement of the alternate suspect defense. Again, we cannot agree.

¶40 Crim. P. 16(II)(c) says that a defendant must disclose "the nature of any defense." As used in this context, the word "nature" means "the inherent character," "basic constitution," or "essence" of the alternate suspect defense. *Nature*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/nature [https://perma.cc/M5GF-DRUG]; *see also Nature*, Black's Law Dictionary (11th ed. 2019) ("A fundamental quality that distinguishes one thing from another; the essence of something."). Merely stating that a defendant intends to point the finger at an alternate suspect without identifying who that suspect is does not convey the inherent quality or essence of the alternate suspect defense. Indeed, such a shallow disclosure imparts almost nothing of substance to the prosecution.

¶41 Our conclusion is buoyed by the last sentence in Crim. P. 16(II)(c): "Upon receipt of the information required by this subsection (c), the prosecuting attorney

---

[3] We need not, and thus do not, address whether the alternate suspect defense is an affirmative defense.

18

shall notify the defense of any additional witnesses which the prosecution intends to call to rebut such defense within a reasonable time after their identity becomes known." Without a defendant's pretrial disclosure regarding the identity of an alternate suspect(s), the prosecution may be forced to call an unendorsed rebuttal witness at trial. That is precisely what the last sentence in Crim. P. 16(II)(c) aims to prevent. And although permitting an unendorsed rebuttal witness to take the stand may prejudice a defendant, a trial court would be hard-pressed to exclude the proposed testimony.

¶42 Accordingly, we hold that Crim. P. 16(II)(c)'s disclosure requirement regarding "the nature of any defense" includes the identity of any alternate suspect. An alternate suspect who is unidentifiable by name must be otherwise identified—e.g., the person whose DNA profile was located at the crime scene but who has not yet been identified by name. To the extent defense counsel intends to call an alternate suspect to testify at trial, the alternate suspect's address, just like the address of any other defense witness, must be provided to the prosecution. *See* Crim. P. 16(II)(c).

¶43 Based on its reading of Crim. P. 16(II)(c), the district court correctly determined that the alternate suspect defense must be endorsed and that any alternate suspect must be identified. But the court didn't stop there. It also directed Dye to disclose "all evidence" bearing on the alternate suspect defense.

In fairness, the district court was validly concerned about tabling the admissibility determinations required by *Elmarr* until the middle of trial. To understand why the prospect of waiting gave the district court heartburn, we turn our attention to *Elmarr* now.

## C. *Elmarr*

¶44 In *Elmarr*, we concluded that the admissibility of alternate suspect evidence is moored to "the strength of the connection between the alternate suspect and the charged crime." ¶ 22, 351 P.3d at 438. Alternate suspect evidence is admissible only if it "establishes a non-speculative connection or nexus between the alternate suspect and the crime charged." *Id.* at ¶ 23, 351 P.3d at 438. Because the touchstone of relevance in this context is whether there is such a non-speculative connection, alternate suspect evidence "must create more than just an unsupported inference or possible ground for suspicion." *Id.* at ¶ 32, 351 P.3d at 439. Otherwise, we risk speculative blaming that heightens the prospect of jury confusion and invites the jury to rest its verdict on emotion or prejudice. *Id.*

¶45 Evidence merely showing that someone else had a motive or an opportunity to commit the charged crime is too speculative because it gives rise "to no more than grounds for possible suspicion"; there must also be evidence "circumstantially or inferentially linking the alternate suspect to the charged crime." *Id.* at ¶ 34, 351 P.3d at 440. Whether the requisite connection exists entails

20

a case-by-case analysis that considers all the evidence proffered by a defendant. *Id.* at ¶ 31, 351 P.3d at 439.

¶46 If the evidence is related to other acts or transactions by the alternate suspect, a trial court must be guided by the tenets of CRE 404(b) and "look to whether all the similar acts and circumstances, taken together, support a finding that the same person probably was involved in . . . the other act[s] and the charged crime." *Id.* at ¶ 23, 351 P.3d at 438. But "the overarching relevance inquiry remains whether the evidence, taken collectively, establishes a non-speculative connection between the alternate suspect and the charged crime." *Id.* at ¶ 40, 351 P.3d at 441.

¶47 Lastly, if the evidence concerns out-of-court statements made by the alternate suspect, a trial court must determine whether those statements satisfy the requirements of any hearsay exception. *Id.* at ¶ 24, 351 P.3d at 438. Even if the statements are admissible under our hearsay rules, the court must still decide whether the statements, along with other proffered alternate suspect evidence, establish the requisite non-speculative connection between the alternate suspect and the charged crime. *Id.*

¶48 While *Elmarr* laid out the blueprint to analyze the admissibility of alternate suspect evidence, we've never been called upon to pass judgment on the applicable procedural mechanics. Mindful of Crim. P. 16(II)(c) and *Elmarr*, we do our utmost now to provide some guidance in this regard.

## D. Procedures Applicable to Alternate Suspect Evidence

¶49    A defendant must endorse the alternate suspect defense, identify any alternate suspects, and disclose the addresses of any alternate suspects who will be called to testify no later than thirty-five days before a felony trial or seven days before a non-felony trial, unless the court extends the applicable deadline for good cause.[4] *See* Crim. P. 16(II)(c).  In the alternate-suspect-defense context, Crim. P. 16(II)(c) permits a defendant to do nothing less and authorizes a trial court to order nothing more.

¶50    From there, it is up to the prosecution to conduct its own investigation into any alternate suspect identified.  Following any such investigation, if the prosecution has a good faith belief that alternate suspect evidence is inadmissible under the criteria we articulated in *Elmarr*, it must file, without undue delay, a pretrial objection explaining its position.[5]

---

[4] Rather than *extend* the applicable deadline of no less than thirty-five days before trial, the district court's alteration *shortened* the applicable deadline by requiring Dye to make disclosures even earlier (no less than forty-five days before trial).  In any event, the record does not appear to contain a finding of good cause to allow the court to extend the applicable deadline.

[5] Of course, prosecutors who forego filing a pretrial objection under *Elmarr*, because they agree that the anticipated alternate suspect evidence is generally admissible, may nonetheless raise objections to specific aspects of that evidence at trial pursuant to our rules of evidence.

¶51  Given the weighty and consequential character of the admissibility determinations delineated by *Elmarr*, a trial court should resolve any disputes related to those determinations before trial.  Waiting until the middle of trial to decide whether alternate suspect evidence is admissible is fraught with peril: It may cause lengthy interruptions, force the judge to make rushed judgments on difficult issues, prevent the parties from discussing concepts related to the alternate suspect defense during jury selection and opening statements, and preclude questioning of some witnesses about the proposed evidence.  Aside from causing disruptions during trial, failing to rule on the admissibility of alternate suspect evidence before trial is also likely to hinder plea negotiations and inhibit the prosecution's ability to decide whether it may ethically proceed with the case.

¶52  We recognize that, at least in this context, the timeliness of pretrial admissibility determinations rests on the horns of a dilemma.  Much like steering between Scylla and Charybdis, trial courts should do their utmost to thread the needle: On the one hand, proceeding prematurely may be ineffective; on the other, waiting until the eve of trial may be problematic.[6]

---

[6] In Homer's Odyssey, Odysseus and his men confront Scylla and Charybdis, sea monsters.  *See in re Briese*, 196 B.R. 440, 443 n.1 (Bankr. W.D. Wis. 1996).  Scylla is a multi-headed giant; Charybdis is a creature who apparently creates a whirlpool by consuming the sea.  *Id.*  As these abominations live upon opposite shores of a very narrow channel, it is virtually impossible to navigate away from one without falling into the clutches of the other.  *Id.*

¶53 But must a trial court hold a hearing in connection with the *Elmarr*-required admissibility determinations? Today we announce that this, too, is a matter within a trial court's discretion. Depending on the circumstances involved in a particular case, a hearing may (or may not) be warranted. If a trial court does hold a hearing, a defendant may proceed by offer of proof. We stress that the purpose of any such hearing would be strictly to permit a trial court to adjudicate any good faith disagreements related to the admissibility of alternate suspect evidence, not to allow the prosecution to embark upon a fishing expedition.

¶54 When confronting the prosecution's good faith objection, a trial court's gatekeeping function under *Elmarr* may occasionally require a defendant to share additional information about the alternate suspect defense. Otherwise, a trial court may be unable to make the requisite admissibility determinations. Relying on our recent decision in *People v. Kilgore*, 2020 CO 6, 455 P.3d 746, Dye pushes back on this front. We are unmoved.

¶55 In *Kilgore*, we disavowed a provision in the district court's case management order requiring the parties in every criminal case to exchange exhibits prior to trial. ¶ 25, 455 P.3d at 751. Of particular interest here, we concluded that "the district court was devoid of authority to require Kilgore to disclose his exhibits to the prosecution before trial." *Id. Kilgore* is inapposite. Nothing we say today should be understood as permitting a trial court to surpass the limits of its authority

pursuant to the terms of Crim. P. 16. *Id.* at ¶ 23, 455 P.3d at 750; *Richardson v. Dist. Ct.*, 632 P.2d 595, 599 (Colo. 1981). Any information a defendant may need to share with a trial court regarding alternate suspect evidence to permit the admissibility determinations required by *Elmarr* would not implicate Crim. P. 16(II)(c) because it would not constitute discovery to be provided to the prosecution. Instead, it would be akin to the type of information defendants sometimes have to proffer to permit a trial court to make pretrial rulings on the admissibility of their proposed evidence. For example, a defendant's proposed evidence related to the defense of insanity, expert opinions of mental condition, other expert opinions, the rape shield statute, and other acts or transactions under CRE 404(b) often requires a court to make pretrial admissibility determinations. And to allow a court to do so may require a defendant to provide information that goes beyond what has already been produced in discovery pursuant to Crim. P. 16(II)(c).

¶56 We underscore that in the alternate-suspect-defense context a defendant would only have to present such information to a trial court in the event the prosecution raises a good faith objection. And then only if that information is necessary to make *Elmarr*'s admissibility determinations.

¶57 The district court and the prosecution observe that the information already in discovery and previously adduced during pretrial hearings will almost always suffice to permit a trial court to make the admissibility determinations mandated

25

by *Elmarr*. We are inclined to agree and thus expect that a defendant will rarely need to offer a trial court previously undisclosed information regarding the alternate suspect defense.

## E. Dye's Constitutional Contentions

¶58 Dye asserts that requiring him to make any pretrial disclosures related to alternate suspect evidence violates his constitutional right to due process and his privilege against self-incrimination. We are unpersuaded.

¶59 Dye's reliance on *Kilgore* is unavailing here too. First, we acknowledge that in *Kilgore*, we said that a trial court may not "require disclosures that infringe on an accused's constitutional rights." ¶ 1, 455 P.3d at 748. But because we concluded that the trial court's order exceeded the discovery authorized by Crim. P. 16, we didn't have to address the merits of Kilgore's constitutional claims. *Id.* at ¶ 2, 455 P.3d at 748. For that reason, we were content to simply note that the order "arguably" infringed on Kilgore's constitutional rights. *Id.* Indeed, Dye concedes that we did not "decide the constitutional issue" in *Kilgore*.

¶60 Second, while we expressed concern in *Kilgore* that allowing the prosecution access to defense exhibits before trial could violate a defendant's constitutional rights by helping the prosecution meet its burden of proof, that concern was rooted in the fact that the district court's discovery order exceeded the contours of Crim. P. 16(II). *Id.* at ¶¶ 23, 27, 29, 455 P.3d at 750–51. We explained that Crim. P. 16(II)

26

"was carefully drafted," and that an omission, far from being an oversight, reflected a deliberate attempt "to prevent the impairment of constitutional rights that arguably could result from a rule permitting the court to enlarge the categories of prosecutorial discovery on the basis of an ad hoc evaluation of each case." *Id.* at ¶ 23, 455 P.3d at 750 (quoting *Richardson*, 632 P.2d at 599). Here, however, as it relates to Crim. P. 16(II)(c), we simply hold that Dye must comply with the requirement to disclose "the nature of any defense," as we construe that phrase today.

¶61 And Dye does not ask us to conclude that Crim. P. 16(II)(c), itself, is unconstitutional—nor is there a tenable basis to do so. Courts have regularly rejected the general argument that statutes and rules requiring defendants in criminal cases to engage in reciprocal discovery are unconstitutional. *See Williams v. Florida*, 399 U.S. 78, 81–82 (1970). As the Court eloquently put it in *Williams*, "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." *Id.* at 82.

¶62 True, we conclude today that, if necessary to allow the district court to make the admissibility determinations outlined in *Elmarr*, it is possible that Dye may need to provide information beyond that produced pursuant to Crim. P. 16(II)(c). But as we mentioned earlier, such information is not meaningfully different from

27

pretrial information defendants sometimes must provide to permit a court to determine the admissibility of their proposed evidence. And Dye does not suggest that it is unconstitutional to compel defendants to share information about their proposed evidence prior to trial. It isn't. Simply advancing the timing of defense disclosures from the middle of trial to earlier in the proceedings does not violate a defendant's constitutional rights. *See People v. Martinez*, 970 P.2d 469, 473 (Colo. 1998) (citing *Williams*, 399 U.S. at 85).

¶63 Lastly, and most significantly, we side with Dye in disapproving of the district court's overbroad order requiring him to disclose "all evidence" related to the alternate suspect defense. Regardless of whether that order may have threatened irreparable harm to Dye's constitutional rights, our opinion does not. To the contrary, our opinion should assuage Dye's concerns. Accordingly, we reject his constitutional challenge.

## F. Instructions on Remand

¶64 Because the district court's order requiring Dye to disclose "all evidence" bearing on the alternate suspect defense exceeded the boundaries of Crim. P. 16(II)(c), it is vacated. On remand, if Dye intends to rely on the alternate suspect defense, he must do the following no later than thirty-five days before trial (or no later than whatever extended deadline the court sets based on good cause): (1) provide notice of his intent to introduce alternate suspect evidence, (2) identify

28

any alternate suspects in accordance with this opinion, and (3) produce the addresses of any alternate suspects he intends to call at trial. *See* Crim. P. 16(II)(c).

¶65 It will then be up to the prosecution to conduct its own investigation into any alternate suspect identified. If Dye identifies someone other than Chuck as an alternate suspect and the prosecution has a good faith belief that evidence related to that suspect is inadmissible under *Elmarr*, it must file, without undue delay, a pretrial objection explaining its position.[7]

¶66 In the event the prosecution files a good faith objection, the district court should rule on it before trial—the most prudent course of action would be to make this determination sometime after expiration of the thirty-five-day deadline (or after whatever extended deadline the court sets based on good cause) but before the eve of trial. In its discretion, the district court may hold a hearing strictly to adjudicate a good faith objection advanced by the prosecution. If the district court does so, Dye may proceed by offer of proof. The information already in discovery and previously adduced during pretrial hearings may well suffice to permit the district court to make the admissibility determinations mandated by *Elmarr*. However, it is possible that the district court's gatekeeping function under *Elmarr* may require Dye to proffer additional information to the court.

---

[7] Recall that the prosecution has already stipulated to the admission of any alternate suspect evidence concerning Chuck.

## IV. Conclusion

¶67 For the foregoing reasons, we vacate the district court's discovery order regarding alternate suspect evidence. Accordingly, we make absolute the rule to show cause.