19CA1278 Peo v Massingill 06-18-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 19CA1278
Mesa County District Court No. 17CR1381
Honorable Gretchen B. Larson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Israel Jerome Massingill,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE KUHN
Fox and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Amy D. Trenary, Alternate Defense Counsel, Broomfield, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Israel Jerome Massingill, was convicted of first degree murder, attempted first degree murder, patronizing a prostituted child, two crime of violence sentence enhancers, and possession of a controlled substance.  He now raises various issues on appeal.  We affirm in part, reverse in part, and remand with directions.

## I.    Background

¶ 2    The jury heard testimony at trial that would have allowed it to find the following facts.  Massingill and one of the minor victims, A.F., met as high-school students.  A.F. had previously had sex with Massingill for money.  One night in July 2017, A.F. and Massingill exchanged text messages about meeting up.  Massingill asked A.F. if she would have sex with him again.  He also said that he would pay her $60 that he allegedly owed her for previously having sex with him.  As later became relevant, A.F. was consistently using methamphetamine and was trying to fund her addiction around this time.  When A.F. agreed to meet up with Massingill, her friend, K.Q., offered to give her a ride.

¶ 3    When they arrived at Massingill's house, A.F. texted him that she was outside.  Massingill came outside and stood by the door.

1

Then A.F. let K.Q. know that A.F. would need about fifteen minutes with Massingill. A.F. went inside Massingill's house and, at some point, he pointed a gun at her. A.F. told Massingill that she wasn't scared of his gun, and he threw the gun onto the couch. A.F. then asked Massingill for the money he owed her, and he grabbed A.F. and threw her onto his bed. Massingill then forced A.F. to have sex with him.

¶ 4 After the encounter, A.F. put her clothes on and got ready to leave. Massingill asked whether she wanted "that hundred." She said yes and that she had a ride waiting outside that could take them to an ATM.

¶ 5 A.F. and Massingill got into K.Q.'s car, and she introduced them. K.Q. then drove them to an ATM at a City Market. When they arrived in the City Market parking lot, K.Q. put the car in park and said that she was "gonna go." Moments later a gun went off. A.F.'s ears started ringing, and she "didn't know what was going on." A.F. looked at K.Q. and saw her slumped over the middle console. A.F. then looked back at Massingill and pleaded for her life. He shot her three times in the arm, but A.F. managed to spray Massingill in the face with pepper spray; he then fled.

¶ 6     A.F. called 911 and waited for the police.  Officers identified Massingill and went to his house.  Massingill "attempted to flee out the back of the residence" but was eventually taken into custody.  A.F. was taken to the hospital to be treated for her injuries.

¶ 7     A jury convicted Massingill of first degree murder, attempted first degree murder, patronizing a prostituted child, two crime of violence sentence enhancers, and possession of a controlled substance.  *See* § 18-3-102(1)(a), C.R.S. 2025; § 18-2-101, C.R.S. 2025; § 18-7-406(1)(a), C.R.S. 2025; § 18-1.3-406(2)(a)(I)(A), (B), C.R.S. 2025; § 18-18-403.5(1), (2)(c), C.R.S. 2025.  The court sentenced him to an aggregate sentence of life in prison without the possibility of parole.

## II.     Analysis

¶ 8     On appeal, Massingill contends that (1) the record is insufficient for meaningful appellate review.  He also contends that the trial court erred by (2) refusing to admit evidence that supported his alternate-suspect defense; (3) limiting his ability to cross-examine A.F. about a material witness warrant required to secure her trial testimony; (4) quashing his subpoena for A.F.'s recorded jail calls; (5) admitting improper expert testimony; and

3

(6) failing to give an elemental instruction. Finally, Massingill contends that (7) cumulative error requires reversal. We address each contention in turn.

## A. The Record

¶ 9 Massingill contends that he should be granted a new trial because "[d]espite arduous reconstruction efforts, the trial transcripts remain so lacking that neither counsel nor this [c]ourt can intelligently review whatever errors they contain." We are not convinced.

### 1. Additional Background

¶ 10 A For The Record (FTR) recording device was used at Massingill's trial. At times during the trial, the FTR failed to record part of what was being said, and the trial transcript was ultimately "riddled with omissions." Massingill filed a motion asking the court to help him reconstruct the trial transcripts. After numerous status conferences and extensive efforts by both parties to reconstruct the trial transcripts, the court approved Massingill's proposed record settlement. Even after the settlement, Massingill asserts that the record still does not fully capture the proceedings below.

### 2. Applicable Law and Standard of Review

¶ 11    Section 16-12-101, C.R.S. 2025, grants a defendant the right to appeal a criminal conviction. *Hoang v. People*, 2014 CO 27, ¶ 39. "Due process and equal protection protect a criminal defendant at trial and on direct appeal." *Id.* So, as a general matter, "a criminal defendant is entitled to a record on appeal which includes a complete transcript of the proceedings at trial." *People v. Rodriguez*, 914 P.2d 230, 300 (Colo. 1996). A defendant seeking "relief on a due process claim arising from an incomplete record . . . must *always* demonstrate specific prejudice resulting from the state of that record." *Id.* at 301.

¶ 12    We review de novo whether the record is sufficient for appellate review. *See Hoang*, ¶ 38.

### 3. The Record Is Sufficient for Appellate Review

¶ 13    First, Massingill argues that there are sixty-one "incomplete bench conferences" that prejudice him because "they leave his counsel unable to protect his basic rights" by identifying potential "winning issues." He also argues that the issue most affected by the deficient trial transcripts is A.F.'s cross-examination about the material witness warrant proceedings, discussed *infra* Part II.C.

5

¶ 14    While Massingill identifies A.F.'s cross-examination as the specific issue that was affected by the transcripts, he ultimately makes the general assertion that a new trial is warranted merely because the missing details of the bench conferences prejudiced his ability to *uncover* winning issues. However, as the *Rodriguez* court held, a defendant must always "demonstrate *specific* prejudice resulting from the state of that record." 914 P.2d at 301 (emphasis added). The broad assertion that the bench conferences *could* have contained "winning issues" does not sufficiently allege specific prejudice.

¶ 15    Second, Massingill claims that the number of indecipherable bench conferences establishes specific prejudice. He asserts these bench conferences "contain argument and ruling on objections during A.F.'s testimony, which is at the heart of five issues presented."

¶ 16    But as the People point out, this case isn't meaningfully different than *Hoang.* In that case, the defendant alleged numerous errors in the record: fifty unrecorded bench conferences, omission of trial testimony, and "approximately sixty [missing] pieces of trial evidence." *Hoang,* ¶ 40. The supreme court ultimately held that

6

Hoang did not identify "potential error[s] that may be concealed in an unrecorded bench conference or other omission in the record," and instead he only speculated as to potential appealable claims contained in the "alleged gaps." *Id.* at ¶ 42.

¶ 17    Massingill attempts to distinguish his case from *Hoang* by arguing that there were sixty-one indecipherable bench conferences, versus only two or three that the court ultimately identified in *Hoang.* And Massingill claims that the reconstruction the trial court adopted expressly connects many of the bench conferences to the issues he presents on appeal. But besides comparing the number of bench conferences affected in his trial to those in the *Hoang* trial, he does not develop an argument to explain why the number of bench conferences alone prejudiced him.

¶ 18    Ultimately, Massingill's claim falls short because he can't identify any specific prejudice resulting from the unrecorded bench conferences. While he identifies twelve bench conferences occurring during A.F.'s testimony, he does not explain why these gaps in the transcripts are prejudicial to his case. Because he has failed to demonstrate specific prejudice resulting from the record — as he must do to prevail — he is not entitled to relief on this basis. *See*

7

*Rodriguez*, 914 P.2d at 301 ("Rodriguez'[s] bare assertion that the incomplete record prejudiced counsel's ability to prepare [his] appeal does not amount to a showing of specific prejudice, and, accordingly, Rodriguez is not entitled to relief."); *see also People v. Whittiker*, 181 P.3d 264, 269 (Colo. App. 2006) (holding that "the transcripts, although flawed, are sufficiently reliable to enable intelligent review of defendant's substantive contentions").

## B.  Alternate-Suspect Defense

¶ 19  Massingill contends that the trial court abused its discretion — and violated his constitutional rights — when it excluded evidence that supported his alternate-suspect defense. We disagree.

### 1.  Additional Background

¶ 20  Before trial, Massingill disclosed that he was asserting a general denial to the charge of patronizing a prostituted child and was defending with consent for the sexual assault charge.  For all other charges, Massingill asserted the affirmative defense of self-defense.

¶ 21  During trial, the defense questioned A.F. about whether

8

- A.F. knew that K.Q. was carrying cash the night K.Q. was murdered;

- A.F. knew that K.Q. often carried cash;

- A.F. dealt drugs on the side and obtained drugs for other people; and

- A.F.'s drug use had affected her personal relationships.

¶ 22    The prosecution raised relevance and hearsay objections throughout this testimony, which the court sustained on multiple occasions.  After a relevance objection to the personal relationships question, the court excused the jury for lunch and held a bench conference to discuss the testimony.

¶ 23    During this conference, defense counsel acknowledged that she understood why the court was sustaining the prosecutor's objections.  She then said that it was time to reveal the defense theory that she intended to present during closing argument. Defense counsel stated that she was "trying to elicit information about [A.F.'s] denigration [sic] of her relationship with her family and her friend[s]" because she planned to argue that it was actually A.F. who shot and killed K.Q., not Massingill.  Defense counsel sought to argue that A.F. "had descended into the pit of

methamphetamine use to such a degree that she was willing to burn any bridge that she may have had," including the one she had with K.Q.

¶ 24     The prosecutor objected to the alternate-suspect defense theory given the lack of notice and the defense's endorsement of a self-defense affirmative defense.  He also cited Crim. P. 16(II)(c), which obligates the defense to disclose the nature of its defense thirty-five days before a felony trial.

¶ 25     The next day, the court issued its ruling.  It relied on *People v. Elmarr*, 2015 CO 53, and the requirement from that case that for alternate-suspect evidence to be relevant, the defense has to establish a nonspeculative connection or nexus between the alternate suspect and the crime charged.  The court also noted that it didn't necessarily read *Elmarr* as applying Rule 16(II)(c)'s disclosure obligation to every alternate-suspect defense theory.  The court then issued a detailed ruling explaining which pieces of the proffered alternate-suspect evidence would be admitted or excluded.

2.     Applicable Law and Standard of Review

¶ 26     Rule 16(II)(c) requires that the defense disclose "the nature of any defense" no less than thirty-five days before trial.  This

requirement applies to the identity of any alternate suspect. *People v. Dye*, 2024 CO 2, ¶ 49. The admissibility of evidence supporting an alternate-suspect defense "depends on the strength of the connection between the alternate suspect and the charged crime." *Elmarr*, ¶ 31. To avoid juror speculation, there must be "reasonable limits on collateral issues." *Id.* Therefore, "alternate suspect evidence must be sufficiently probative to be admissible; that is, it must be both relevant (under CRE 401) and its probative value must not be sufficiently outweighed by the danger of confusion of the issues or misleading the jury . . . (under CRE 403)." *Id.* Whether the alternate-suspect evidence is relevant depends on if the defense "establishes a non-speculative connection or nexus between the alternate suspect and the crime charged." *Id.* at ¶ 32.

¶ 27    "We review evidentiary rulings for an abuse of discretion. A [trial] court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People v. Morse,* 2023 COA 27, ¶ 39 (citation omitted). We review de novo "a defendant's claim that the government violated their constitutional right to present a defense." *Rios-Vargas v. People,* 2023 CO 35, ¶ 19. "An erroneous evidentiary ruling may . . . rise to

11

the level of constitutional error if it deprived the defendant of any meaningful opportunity to present a complete defense." *People v. Conyac*, 2014 COA 8M, ¶ 93.

### 3. The Court Did Not Abuse Its Discretion or Violate Massingill's Constitutional Rights

¶ 28 Massingill first contends that while he did not file a pretrial endorsement of an alternate-suspect defense, the prosecution was still on notice because A.F. was "their own indispensable witness." The People argue that because Massingill failed to disclose his alternate-suspect defense, the issue is unpreserved.

¶ 29 We are not persuaded that A.F.'s status as the prosecution's witness provided notice of Massingill's alternate-suspect defense. However, we agree with Massingill that neither the defense nor the trial court had the benefit of *Dye* at the time of the trial. *Dye* requires that an alternate-suspect defense be disclosed thirty-five days before trial under Rule 16(c). *Dye*, ¶ 49. But *Dye* was decided five years after Massingill's trial. And at the time of that trial, there was no case holding that an alternate-suspect defense had to be disclosed as "the nature of [a] defense" under Rule 16(II)(c).

¶ 30    Regardless, the fact that the prosecution's objection would have come out differently under later case law doesn't implicate preservation as to Massingill's challenge.  "To preserve an issue for appeal, an appellant, during trial, must raise it in a manner specific enough that it 'draws the [trial] court's attention to the asserted error.'"  *Wolven v. Velez*, 2024 COA 8, ¶ 8 (alteration in original) (quoting *People v. McFee*, 2016 COA 97, ¶ 31).  After the trial court permitted Massingill to pursue his alternate-suspect defense involving K.Q., it precluded some of his proffered witness testimony.  That was sufficient to preserve his challenge for appeal.

¶ 31    As for the substance of his challenge, Massingill argues that the trial court abused its discretion when it excluded the alternate-suspect evidence and prohibited cross-examination about (1) text messages that A.F. was dealing, trading, and panhandling for drugs; (2) text messages that A.F. was feeling suicidal and "wished drugs would take her life"; (3) testimony about whether A.F. had stolen a former roommate's gun; and (4) testimony about whether "K.Q. gave A.F. money for cigarettes on the night of the shooting and A.F. lied and said she forgot the change at the store."  We address each piece of evidence in turn.

13

¶ 32     The court prohibited text messages between A.F. and a friend about trading pills for meth and cross-examination about whether A.F. was dealing, trading, and panhandling for drugs.  It determined that this was prohibited character evidence and evidence of other bad acts.  It also ruled that "the fact that [A.F.] was dealing drugs doesn't create a [nonspeculative] connection that she then murdered [K.Q.]"

¶ 33     CRE 404(a) generally prohibits evidence of a person's character to "prov[e] that the person acted in conformity therewith on a particular occasion."  Rule 404(b)(1) prohibits "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  And although Rule 404(b) principles guide the analysis, the "touchstone" of relevance in the alternate suspect context is whether the evidence establishes a nonspeculative connection between the alternate suspect and the crime.  *Elmarr*, ¶¶ 23, 39.

¶ 34     Here, the evidence of selling and trading for drugs that defense counsel sought to admit constituted prohibited bad acts under Rule 404(a).  And the jury had already heard A.F.'s own testimony about

14

her struggle with addiction. Moreover, whether A.F. allegedly sold and traded for drugs did not create a nonspeculative nexus that she was the one to pull the trigger. That evidence simply does not make it more likely that she was the one who killed K.Q. Instead, it leads only to a speculative connection that all drug dealers are violent, A.F. dealt drugs, and therefore she killed K.Q. This falls outside the scope of alternate-suspect evidence permitted by *Elmarr*.

¶ 35 The court also observed that A.F.'s suicidal thoughts and feelings may have been "the musings of a young woman who was . . . in the grip of a horrific addiction," and it concluded that these thoughts didn't make it more likely that she killed K.Q. We likewise fail to see how A.F.'s alleged suicidal thoughts created a nexus between her and K.Q.'s murder. The proffered testimony did not detail A.F. wanting to murder K.Q.; instead, A.F.'s thoughts were of potentially wanting to hurt herself. The evidence of A.F.'s suicidal thoughts, therefore, did not establish a nonspeculative connection between her and K.Q.'s murder. *See Elmarr*, ¶ 23.

¶ 36 Next, the court held that evidence of A.F. stealing a friend's shotgun was not relevant because it was more bad acts evidence, and K.Q. was not murdered with a shotgun. Massingill argues that

15

the evidence "was probative of whether A.F. also robbed K.Q. (and in the course, killed her)." We disagree. The alleged theft of the shotgun was not relevant because it was not the gun that killed K.Q. The proposed chain of relevance relies on the prohibited bad character inference that because A.F. previously stole something, she was also more likely to commit a murder. And finally, stealing a shotgun that was not used to kill K.Q. does not create a nonspeculative nexus between A.F. and the murder.

¶ 37    The court next ruled that evidence that K.Q. gave A.F. money to buy cigarettes and that A.F. lied about leaving the change on the counter was "just character evidence" that didn't make it more likely that A.F. killed K.Q. Massingill argues that evidence that "A.F. stole money from K.Q. that same night was highly probative of whether she did so again in a manner that escalated to K.Q.'s death." Again, we are not convinced. This is also prohibited character evidence. Moreover, as the court found, the fact that A.F. lied about keeping the change from a cigarette purchase does not establish that A.F. later pulled the trigger and killed K.Q. *See Elmarr*, ¶ 23.

16

¶ 38    Therefore, the court did not abuse its discretion when it excluded alternate-suspect evidence that did not create a nexus between A.F. and K.Q.'s murder. *See Morse*, ¶ 39.

¶ 39    Finally, Massingill contends that the trial court's evidentiary rulings violated his constitutional rights to due process, to present a complete defense, and to confront witnesses against him. While the court limited some areas of inquiry in the alternate-suspect evidence that Massingill could present, it also allowed Massingill to present other evidence supporting his alternate-suspect defense. For example, the court allowed the defense to cross-examine A.F. about how her relationship with family deteriorated, whether A.F. lied to doctors and nurses about the last time she used methamphetamine on the night of the murder, A.F.'s familiarity with guns, and anything related to who actually pulled the trigger. Consequently, the court allowed Massingill a meaningful opportunity to present an alternate-suspect defense, while also excluding inadmissible alternate-suspect evidence under *Elmarr*. As a result, we can't say that Massingill was denied "any meaningful opportunity to present a complete defense" or that he was "denied virtually his only means of effectively testing significant

17

prosecution evidence." *Conyac*, ¶ 93. Likewise, the trial court has wide latitude to place limits on cross-examination, even in the confrontation context. *See People v. Carter*, 2015 COA 24M-2, ¶ 33. Given our analysis above, we are not persuaded that the proposed cross-examination would have left the jury with "a significantly different impression" of A.F.'s credibility. *Id.* at ¶ 31 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

¶ 40    Accordingly, we also perceive no errors of constitutional dimension in the trial court's rulings.

## C.    Material Witness Warrant

¶ 41    Massingill contends that his rights to confrontation and a complete defense were violated when the trial court "severely limit[ed] his ability to cross-examine the alternate suspect about the material witness warrant required to secure her trial testimony."

### 1.    Additional Background

¶ 42    Before trial, the prosecution filed a motion in limine for a pretrial ruling on admissibility. It moved to admit certain statements that A.F. had made because, although the prosecution and defense had made "efforts to locate her [and] serve her with a subpoena for the upcoming trial," they anticipated that A.F. would

18

not be present at the trial. This is because she was "on the run with a warrant active for a probation violation in [an unrelated] juvenile case." Given the uncertainty of A.F.'s attendance at trial, the prosecution filed a proposed certificate and warrant "requesting that [A.F.] be brought immediately before [the court]" because she was a material witness and so the prosecution could guarantee her attendance at Massingill's trial. The court imposed a $10,000 bond with pretrial services and a GPS ankle monitor.

¶ 43 Almost two months later, A.F. violated the terms and conditions of her bond by removing the GPS monitor. On the prosecution's request, the court modified A.F.'s bond to $10,000 cash or surety bond, with a new GPS ankle monitor, in the event that A.F. was released from custody on the unrelated juvenile case.

¶ 44 On the first morning of trial, the court held a brief motions hearing before the jury was brought in. During this hearing, defense counsel asked the court if she could cross-examine A.F. about the fact that A.F. was still in custody due to the material witness bond. The court ruled that the defense would not be permitted to cross-examine A.F. about her custody status. The court further explained that A.F. would be in custody regardless of

the material witness bond because she was serving a sentence for the unrelated juvenile case. The court then concluded that it would permit "limited cross-examination" on A.F.'s reluctance to testify and indicated it would make a further order after A.F.'s direct examination.

¶ 45　　After A.F.'s direct testimony, the court noted that A.F.'s willingness to testify was relevant to her credibility as the only other person who witnessed K.Q.'s murder. It clarified that the defense could not cross-examine A.F. about the "court process" — in other words, that a warrant was issued and a bond set to secure A.F. as a witness. However, the court allowed the defense to examine A.F. about whether she wanted to be at trial, whether a GPS monitor was placed on her, and whether she had cut that monitor off.

2.　　Applicable Law and Standard of Review

¶ 46　　The United States and Colorado Constitutions guarantee "[t]he right to confront and cross-examine witnesses." *People v. Houser*, 2013 COA 11, ¶ 58. While a trial court has "wide latitude to reasonably limit cross-examination, [it] must 'allow broad cross-examination of a prosecution witness with respect to the witness'[s] motive for testifying, especially . . . where [her] testimony against

the defendant might be influenced by a promise of, or hope or expectation of, immunity or leniency.'" *Id.* (alterations in original) (citation omitted) (quoting *People v. King*, 498 P.2d 1142, 1144-45 (Colo. 1972)). "A confrontation violation occurs if the defendant 'was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness,' which leaves the jury with a 'significantly different impression of the witness's credibility.'" *Id.* at ¶ 59 (quoting *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008)).

¶ 47     We review de novo a possible confrontation violation. *People v. Hernandez*, 2021 CO 45, ¶ 18.

### 3. The Trial Court's Restrictions on Cross-Examination Did Not Violate Massingill's Confrontation Rights

¶ 48     Massingill argues that the "jury was left with a fundamental misunderstanding of [A.F.'s] credibility, bias, motive, and interest" because the court limited cross-examination. But defense counsel was permitted to cross-examine A.F. in these areas. The court allowed defense counsel to ask A.F. if she wanted to be at the trial, whether a GPS monitor was placed on her, and whether she had cut it off. These questions allowed defense counsel to explore A.F.'s

21

credibility, bias, motive, and state of mind. The court only limited defense counsel from getting into the unnecessary procedural background about the material witness warrant.

¶ 49 Given this scope of cross-examination, Massingill doesn't explain how the jury would have been left with a "significantly different impression" of A.F.'s credibility. *Houser*, ¶ 59 (quoting *Kinney*, 187 P.3d at 559). As the trial court pointed out, A.F. would have been in custody regardless of the bond, so her custody status couldn't reflect on her credibility. And Massingill was able to explore his main point: that A.F. was less credible as a purported victim because she didn't want to be at the trial. Given these facts, we cannot say that Massingill's confrontation right was violated. *See id.*

### D. Subpoena Duces Tecum

¶ 50 Massingill contends that the trial court erred when it granted a motion to quash his subpoena duces tecum filed by the Mesa County Sheriff's Office (MCSO).

#### 1. Additional Background

¶ 51 In November 2018, Massingill served a subpoena duces tecum on the MCSO for all of A.F.'s jail calls from August 2018 to the date

of the subpoena. The MCSO complied and provided Massingill with the recorded jail calls. Then in December, Massingill submitted a Rule 16 discovery request to the prosecution for A.F.'s jail calls from October 2018 to the date of the request. The prosecution responded that it was not in possession of the call recordings and recommended that Massingill contact the MCSO with his request. In February 2019, Massingill then served another subpoena duces tecum on the MCSO for all of A.F.'s jail calls from December 2018 to the date of that request. The MCSO moved to quash the subpoena because there were 150 calls "that would be responsive to the subpoena," and it would take about five hours to review the calls.

¶ 52 The trial court granted the MCSO's motion to quash. It ruled that the prosecution was not obligated to disclose the jail calls because the calls were not in the prosecution's possession and the calls were "apparently recorded for jail security purposes." The court also found that employees of the jail did not "regularly report" to the District Attorney's Office. Then the court concluded that it could not find that "any statements that [A.F.] made in a telephone

call to some unknown individual are automatically 'statements' that are subject to the mandatory disclosure provisions of Rule 16."

¶ 53     Next, the court ruled that Massingill didn't meet his burden under *People v. Spykstra*, 234 P.3d 662 (Colo. 2010), and therefore it was appropriate to quash the subpoena under Crim. P. 17(c).

¶ 54     Lastly, the court concluded that Massingill should have filed a request under the Colorado Criminal Justice Records Act (CCJRA) to obtain the call recordings but that he failed to do so.  In his response to the motion to quash, Massingill had asked the court to find that the MCSO did not conduct a "proper balancing test" even though he hadn't filed a CCJRA request.  The court ruled that because Massingill hadn't filed the CCJRA request, A.F. didn't have notice that Massingill wanted "copies of telephone conversations that may be privileged or may contain confidential . . . information." The court then denied the request on those grounds as well.

2.     Applicable Law and Standard of Review

¶ 55     Rule 16(I)(a)(1) obligates prosecutors to make certain material and information within their possession or control available to the defense.  This obligation extends to "material and information in the possession or control of members of his or her staff and of any

others who have participated in the investigation or evaluation of the case and who either regularly report, or with reference to the particular case have reported, to his or her office." Crim. P. 16(I)(a)(3).

¶ 56 Rule 17(c) "is the means by which the prosecution and defendant may compel third parties to produce evidence for use at trial." *Spykstra*, 234 P.3d at 668. Rule 17(c) permits a party to use a subpoena duces tecum, which "requires in-court production." *Id.* This method protects third parties from unreasonable searches and seizures. *Id.* Rule 17(c) also allows the court to "quash or modify the subpoena if compliance would be unreasonable or oppressive." When a third party challenges a subpoena, the court turns to the *Spykstra* factors to evaluate the challenge. A party must demonstrate the following factors to avoid the subpoena duces tecum being quashed:

> (1) A reasonable likelihood that subpoenaed materials exist, by setting forth a specific factual basis;
>
> (2) That the materials are evidentiary and relevant;

(3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;

(4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and

(5) That the application is made in good faith and is not intended as a general fishing expedition.

*Spykstra*, 234 P.3d at 669.

¶ 57 "We review a district court's decision to quash a subpoena for an abuse of discretion. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law." *People v. Cline*, 2022 COA 135, ¶ 14 (citations omitted). We review a trial court's "resolution of discovery issues, including its decision whether to review . . . records in camera," for an abuse of discretion. *People v. Herrera*, 2012 COA 13, ¶ 10.

### 3. The Trial Court Did Not Abuse Its Discretion When It Quashed Massingill's Subpoena Duces Tecum

¶ 58 Massingill argues that the recorded jail calls were discoverable for numerous reasons under Rule 16, they should have been made available with the subpoena duces tecum under Rule 17, and the

26

trial court should have reviewed the records in camera before quashing the subpoena. Accordingly, he asks us to reverse the court's order quashing the subpoena.

### a.    Rule 16

¶ 59    First, Massingill claims that the "premise" that recorded jail calls are only used for security purposes "defies credulity" because "[p]rosecutors routinely rely on jailhouse phone calls as trial evidence." Rule 16(I)(a)(3) extends disclosure obligations to individuals who "either regularly report, or . . . have reported, to [the prosecution]." Massingill is correct that jail calls can be recorded for a number of purposes and that not all of those purposes are for security. But as we detail below, A.F.'s jail calls were not being monitored or surveilled. According to the MCSO's unchallenged account, they were being routinely recorded for security purposes like all other calls in the jail.

¶ 60    Second, Massingill argues that the calls were discoverable because Rule 16 obligations extend to "any law enforcement agency 'that participated in the investigation . . . of the case.'" *See* Crim. P. 16(I)(a)(3). While this argument accurately states the provision of Rule 16, it does not inevitably mean that A.F.'s jail calls are subject

to disclosure under the rule.  As the People point out, A.F. was in custody in the jail for an unrelated case and, "to the extent she had to stay in custody due to the material witness warrant, that warrant was tethered to the prosecution's concerns surrounding her addiction and evasive behavior."  The fact that A.F. happened to be in custody does not mean that the jail was investigating her, either generally or in connection with this case.  A.F. was in custody for an unrelated juvenile case and to guarantee her presence at trial.  The fact that the MCSO was holding A.F. does not mean that it was investigating her.

¶ 61     Third, Massingill argues that A.F.'s jail calls were electronic surveillance and were therefore subject to Rule 16(I)(a)(1)(VI), which requires the prosecution to disclose "[a]ll tapes and transcripts of any electronic surveillance (including wiretaps) of conversations involving the accused, any codefendant or witness in the case."  Massingill asserts that the calls were electronic surveillance because they were the "interception and recording of oral communications."  But we see nothing in the record supporting the theory that A.F.'s jail calls were being surveilled or "intercepted."  As noted above, according to the MCSO, A.F.'s jail calls — along

with all the jail calls in general — were being recorded for security purposes.  And while all jail calls were recorded for jail security purposes, the record at the hearing indicated that A.F.'s jail calls were not under surveillance.  Because A.F.'s jail calls were not subject to electronic surveillance, they were not discoverable under this provision of Rule 16.  Accordingly, the prosecution did not have an obligation to disclose the recordings.

¶ 62    Fourth, Massingill argues that Rule 16 also mandates disclosure of information "which tends to negate the guilt of the accused as to the offense charged."  Crim. P. 16(I)(a)(2).  He argues that "[n]either the prosecution nor [the] MCSO asserted that the recorded calls don't contain statements that either negate Massingill's guilt or bear on A.F.'s credibility."

¶ 63    It is true that *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  However, as far as we can tell, Massingill only speculates that A.F.'s jail calls could contain evidence favorable to Massingill.  Neither the prosecution nor the MCSO indicated that the jail calls contained statements

29

that negated Massingill's guilt. Nor does Massingill advance any basis upon which we could conclude that the jail calls contained exculpatory statements. Accordingly, the prosecution wasn't required to review the jail calls for potential exculpatory evidence under these circumstances. *See People v. Williams*, 2019 COA 32, ¶ 32 ("[T]he state has no duty to have evidence tested on the speculative basis that it might have some unspecified use for exculpatory purposes." (quoting *People v. Apodaca*, 998 P.2d 25, 30 (Colo. App. 1999))).

¶ 64 Finally, Massingill argues that even if the Rule 16(I)(a) discovery request did not extend to the MCSO, disclosure was required under Rule 16(I)(c)(1) because the jail calls were "in the possession or control of other governmental personnel." He also claims that the prosecution "refused to make any efforts to obtain the calls from [the] MCSO."

¶ 65 Rule 16(I)(c)(1) requires that

> [u]pon the defense's request and designation of material or information which would be discoverable if in the possession or control of the prosecuting attorney and which is in the possession or control of other governmental personnel, the prosecuting attorney shall use

30

diligent good faith efforts to cause such
material to be made available to the defense.

¶ 66     Because the jail calls were not discoverable under Rule 16 in

the first place, the prosecution had no obligation to use "diligent

efforts" to obtain the calls from the MCSO under Rule 16(I)(c)(1).

¶ 67     Therefore, the trial court did not err when it quashed

Massingill's subpoena for A.F.'s jail calls.

### b.     Rule 17

¶ 68     Massingill next argues that his subpoena for the records was

authorized under Rule 17 because they were "in the possession or

control of other governmental personnel" within the meaning of

Rule 16(I)(c)(1).  He argues that even if the prosecution didn't have

to disclose the records under Rule 16, he still should have been

able to obtain them under Rule 17.  And he further argues that the

*Spykstra* test does not apply in this case because "Massingill's

subpoena was issued to a government entity, not a third party."

¶ 69     Rule 17(c) is designed to protect third parties from

unreasonable searches and seizures through the use of subpoenas.

*Spykstra,* 234 P.3d at 668.  Therefore, a defendant must satisfy the

five-factor *Spykstra* test to defeat a motion to quash a subpoena.

*Id.* at 669. While it is true, as Massingill argues, that government entities do not have constitutional rights, that question only governs a portion of the analysis. And there is nothing in the rule or *Spykstra* excluding government entities as third parties entitled to the rule's protection.

¶ 70     Moreover, Massingill doesn't address the trial court's reasoning for denying his request under Rule 17. The court ruled that Massingill had failed to carry his burden of showing that the request was not a general fishing expedition. A subpoena duces tecum cannot be used as a general fishing expedition. *Id.*; *see also People v. Baltazar*, 241 P.3d 941, 944 (Colo. 2010) ("Both [the Colorado Supreme Court] and the United States Supreme Court have emphasized that their respective rules permit subpoenas only for the production of 'evidence' — not as an investigative tool."). Given this record — over 150 subpoenaed calls with no showing of any specific evidentiary value — we perceive no abuse of the trial court's discretion when it granted the MCSO's motion to quash under Rule 17.

### c. Review of Records In Camera

¶ 71    Finally, Massingill argues that regardless of whether the trial court should have permitted the records to be subpoenaed under Rule 16 or Rule 17, it abused its discretion by quashing the subpoena rather than reviewing the call recordings in camera. He asks that we remand the case to the trial court so that it can screen the records for privileged or confidential information. This, he argues, would then allow him "to demonstrate a reasonable probability that, had the calls been disclosed before trial, the result would have been different."

¶ 72    Disclosure to a criminal defendant of confidential information requires that a trial court conduct an in camera review. *Herrera,* ¶ 14. After the in camera review, the trial court "must then determine what discoverable information in the records, if any, must be disclosed to the defendant." *Id.* However, as we determined above, A.F.'s jail calls were not discoverable under Rule 16 and were not accessible through subpoena under Rule 17. It follows that the court did not abuse its discretion by not conducting an in camera review because Massingill did not show an entitlement to access the jail call recordings in the first place.

33

E.    Possession of a Controlled
Substance Conviction

¶ 73    Massingill contends that the possession of a controlled

substance conviction for count 12 must be reversed because the

court improperly admitted expert testimony and did not give an

elemental instruction to the jury on that count.  Massingill did not

raise an objection on either ground during his trial.  We agree as to

his latter claim.

1.    Standard of Review and Applicable Law

¶ 74    "We review unpreserved trial errors for plain error."  *People v.*

*Hamilton*, 2019 COA 101, ¶ 14.  "Plain error is obvious and

substantial[,] . . . [and review for plain error] permit[s] an appellate

court to correct 'particularly egregious errors.'"  *Hagos v. People*,

2012 CO 63, ¶ 14 (quoting *Wilson v. People*, 743 P.2d 415, 420

(Colo. 1987)).

¶ 75    To rise to the level of plain error, the error "must be so clear-

cut, so obvious, that a trial judge should be able to avoid it without

benefit of objection."  *People v. Pollard*, 2013 COA 31M, ¶ 39.  An

error is ordinarily this obvious if it violates "(1) a clear statutory

command; (2) a well-settled legal principle; or (3) Colorado case

34

law." *Scott v. People*, 2017 CO 16, ¶ 16 (quoting *Pollard*, ¶ 40). An error is substantial, warranting reversal, "only if [it] 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

¶ 76 A trial court has "a duty to instruct the jury properly on all of the elements of the offenses charged." *People v. Bastin*, 937 P.2d 761, 764 (Colo. App. 1996). If a jury is not properly instructed on a charge, then it cannot decide that charge. *People v. Wambolt*, 2018 COA 88, ¶ 38.

### 2. Massingill Did Not Waive His Instructional Challenge

¶ 77 Massingill contends that the trial court plainly erred when it failed to properly instruct the jury on the elements of the possession charge. The People respond that Massingill's contention "should be rejected as waived or invited" because he conceded guilt for the possession charge during opening statements and "strategically used that concession to successfully argue against additional charges relating to sexual assault."

¶ 78     A waiver is an "*intentional* relinquishment of a *known* right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)). A forfeiture, however, is "the failure to make [a] timely assertion of a right." *Id.* at ¶ 40 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). This distinction is important because a waiver "extinguishes error, and therefore appellate review, but a forfeiture does not." *Id.* We review forfeited errors for plain error. *Id.*

¶ 79     The People cite *People v. Garcia*, 2025 COA 98, in support of their claim that Massingill waived his right to appeal this issue by conceding to the possession charge. A division of this court held in *Garcia* that "when defense counsel tells the jury to find the defendant guilty of one of the charged offenses during closing argument, the defendant has waived the ability to claim on appeal that there was insufficient evidence to support a conviction for that offense." *Id.* at ¶ 1. Put another way, the division said that this move "is akin to defense counsel stating that there was sufficient evidence to convict [the defendant] of [that offense]." *Id.* at ¶ 23.

¶ 80     But in this case, defense counsel did not concede guilt during closing argument. Instead, during his opening statement, defense

36

counsel said, "We admit to you count 12, possession of Xanax. And Israel Massingill was drunk that night. He was high on Xanax, and the District Attorney has charged him with the possession of the Xanax. So the complaint charges Israel Massingill with patronizing a prostituted child . . . . We admit that." The *Garcia* division made clear that a concession of this sort during opening statement does not, without more, amount to waiver. *Id.* at ¶ 24 n.3.

¶ 81    Moreover, at the close of evidence, the defense didn't concede the charge. Instead, defense counsel moved for a judgment of acquittal for, among other counts, the possession charge. Specifically, defense counsel argued,

> Count 12, Your Honor, you saw the testimony, you saw the, the evidence, the baggie. It was basically residue. However, I understand that the law allows residue to be considered, if it's a quantifiable amount, for possession. The law allows that. I, but where . . . the bag was found was within a handlebar grip found within Mr. Massingill's bedroom. So part of possession requires knowing, dominion, and control. So possession, then, requires that Mr. Massingill, 1, knew there was that little baggie in the basement, 2, knew that it was in a handlebar grip that was not on a bicycle, Your Honor, 3, knew that it contained alprazolam. There has not been sufficient and substantial evidence to prove to the Court the knowledge

> requirement that is necessary for count 12,
> Your Honor. Thank you very much.

*Garcia* permits defense counsel to "pivot" between opening statement and closing argument, just as defense counsel did here. *Id.*

¶ 82 Likewise, during closing argument, defense counsel admitted guilt to patronizing a prostituted child. Counsel told the jury, "[W]e've already admitted to you that Israel Massingill is guilty of patronizing a prostituted child." But defense counsel made no such admission of guilt as to the possession charge. Based on the motion for judgment of acquittal and closing argument, both made after the jury heard the evidence, we can't say that Massingill conceded that there was sufficient evidence for the jury to find that he knowingly possessed the baggie of Xanax.

¶ 83 Moreover, Massingill doesn't argue sufficiency of the evidence on appeal. Instead, he argues that he was entitled to an elemental instruction. We see no indication on this record that he intentionally waived that issue. Indeed, while defense counsel conceded guilt to the patronizing a prostituted child charge in closing argument, the parties still included an elemental instruction

for that charge in the jury instructions. But the possession charge appears to have been simply overlooked during the jury instruction conference. Indeed, while the court listed all the charges in the jury instructions, and provided verdict forms for all the charges, it omitted the elemental instruction solely for the possession charge. The error appears to have been inadvertent, which makes it a forfeiture. *See Rediger*, ¶¶ 43-44 (noting that with no evidence that the defendant knew of a discrepancy in the jury instructions, the supreme court "conclude[d] that neglect, not intent, explains [the defendant's] lack of an objection"). We therefore review this forfeited error for plain error. *Id.* at ¶ 40.

### 3. The Trial Court Plainly Erred When It Failed to Properly Instruct the Jury on the Possession Charge

¶ 84    Massingill contends that the trial court's failure to instruct the jury on the possession charge was plain error because it violates well-settled law. We agree.

¶ 85    Plain error is obvious when it violates "a well-settled legal principle." *Scott*, ¶ 16 (quoting *Pollard*, ¶ 40). And it is a well-settled principle that "[t]he jury cannot decide a charge on which it was not instructed." *Wamboldt*, ¶ 38. The People concede

that the omission of the elemental instruction was obvious, and we agree. The trial court erred by failing to instruct the jury on the possession charge.

¶ 86    The People, however, argue that while the error may have been obvious, it was not substantial and did not "cast serious doubt on the reliability of the judgment of conviction." They argue that the facts clearly supported defense counsel's concession during opening statements and that the elements of possession were contained in the verdict form.

¶ 87    As to the elements, that argument is not right. Notably, "knowingly" — the very element Massingill specifically challenged in his motion for judgment of acquittal — did not appear in the verdict form.

¶ 88    Further, "[d]ue process under both the state and federal constitutions requires that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the charged offense." *Cooper v. People,* 973 P.2d 1234, 1242 (Colo. 1999). This is why "the trial court must properly instruct the jury on every essential element of the charged offense." *Id.* While the People say that "the facts clearly supported" Massingill's concession from

opening statements, they don't identify those facts with any specificity. Further, we conclude this record doesn't overcome the instructional error. Without an elemental instruction, the jury had no way of knowing whether the prosecution had met its burden on the possession charge. Thus, the omission of an elemental instruction under these facts "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction" for that count. *Hagos*, ¶ 14 (quoting *Miller*, 113 P.3d at 750).

¶ 89 Accordingly, we reverse the conviction on count 12, possession of a Schedule III, IV, or V controlled substance, and remand the case for a new trial on that count.

¶ 90 Given that we reverse this conviction, and the fact that the evidence is unlikely to unfold in the same way on remand, we decline to address Massingill's challenge to the expert testimony identifying the alprazolam in the baggie. *See People v. Gulyas*, 2022 COA 34, ¶ 29.

## F. Cumulative Error

¶ 91 Finally, Massingill contends that the cumulative effect of these alleged errors prejudiced him and deprived him of a fair trial.

¶ 92    The cumulative error doctrine applies when "the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (alteration in original) (quoting *People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980)). We have identified only the trial court's plain instructional error for the possession charge, not multiple errors.  Because we determine that the trial court did not commit multiple errors, the cumulative error doctrine does not apply.  *See id.* at ¶ 25.  We therefore reject Massingill's last contention.

## III.    Disposition

¶ 93    The judgment of conviction on count 12, possession of a Schedule III, IV, or V controlled substance, is reversed, and the case is remanded for a new trial on that count and any further proceedings consistent with this opinion that the trial court may find necessary.  The remainder of the judgment is affirmed.

JUDGE FOX and JUDGE SULLIVAN concur.